### THE SAMSON.†

### BARGES NOS. 8, 9, AND 27.

(Circuit Court of Appeals, Ninth Circuit.   October 13, 1914.)

No. 2393.

1. ADMIRALTY (§ 118*)—REVIEW ON APPEAL—FINDINGS OF FACT.

In cases on appeal in admiralty, when questions of fact are dependent on conflicting evidence, the decision of the district judge, before whom the case was tried, and who heard and saw the witnesses, will not be reversed, unless clearly against the evidence.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 758–775, 794; Dec. Dig. § 118.*]

2. COLLISION (§ 66*)—MEETING TOWS—UNMANAGEABLE TOW.

A finding by the district court that a collision on the Columbia river at night between barges loaded with stone in tow of a tug passing down, which had a barge on each side and one in front, and a steamer coming up with an oil barge on her side, was due to the fault of the tug, whose

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Index-

† Rehearing denied November 17, 1914.

tow became unmanageable, and was carried by the current over toward the Oregon side of the river, *held* supported by the evidence.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 84; Dec. Dig. § 66.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

**3. COLLISION (§ 132*)—SUIT FOR DAMAGES—MEASURE OF DAMAGES.**

Where a vessel, which became a total loss as the result of a collision, had no market value, the cost of her construction, with proper deduction for depreciation, may properly be taken as the measure of damages.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 286; Dec. Dig. § 132.*]

Appeal from the District Court of the United States for the District of Oregon; Edward E. Cushman, Judge.

Suit in admiralty for collision by the Shaver Transportation Company, owner of the steamer Henderson, against the steam tug Samson and barges No. 8, No. 9, and No. 27, Columbia Contract Company, claimant, with the Standard Oil Company of California impleaded. Decree against respondent vessels, and claimant appeals. Affirmed.

For opinion below, see 208 Fed. 347.

Libel in rem against the steamer Samson and barge No. 8, barge No. 9, and barge No. 27, owned by the Columbia Contract Company, and libel in personam against the Standard Oil Company of California, owner of oil barge No. 93, for damages for loss of the steamer Henderson.

Teal, Minor & Winfree and Rogers MacVeagh, all of Portland, Or., for appellant.

Wood, Montague & Hunt, of Portland, Or., for appellee.

Snow & McCamant and George B. Guthrie, all of Portland, Or., for Standard Oil Co.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. 1. This action is the result of a collision between the steamship Henderson and a barge loaded with stone in tow of the tugboat Samson on the Columbia river on July 22, 1911, at about 1:40 a. m.

The Henderson was a stern-wheel river steamer 158 feet long with a beam of 31.6 feet. At the time of the accident, she was proceeding up the river at a speed of about three or four miles an hour, and was towing a steel oil barge, known as barge No. 93, owned by the Standard Oil Company. The oil barge was 300 feet long, with a beam of 34 feet. The Henderson was lashed to the port quarter of the oil barge in such manner that she extended along the port side of the barge a distance of about 100 feet; the stem of the Henderson being slightly inclined toward the side of the oil barge. The barge had no motive power of her own; but the pilot who was in command of both vessels was stationed on the oil barge, and the steering of both vessels was directed by him from the deck of the oil barge.

The Samson was a sea-going tugboat about 110.4 feet long with a beam of 25.4 feet. She was proceeding down the river at a speed of

about seven miles an hour, and was towing three barges (Nos. 8, 9 and 27), each of which was loaded with about 1,000 tons of stone. The barges were arranged in what is known as a "spike tow"; barge No. 8 being lashed to the starboard side of the Samson in such position that the stern of the barge was about abreast of the beam of the tugboat, barge No. 9 being lashed to the port side of the Samson and opposite to and abreast of barge No. 8, and barge No. 27 being lashed between barges Nos. 8 and 9 and directly in front of the tugboat, the stern of barge No. 27 setting against the stem of the tugboat. Barge No. 8 and barge No. 9 were about 160 feet long, with a beam of 38 feet. Barge No. 27 was 150 feet long, with a beam of 36 feet. Barges Nos. 8 and 9 extended in front of the stem of the Samson for a distance of about 90 feet, and barge No. 27 extended in front its full length of 150 feet. The barges were propelled and steered by the tugboat and were in command of a pilot who was stationed on the tugboat.

The night of the accident was dark, but clear. There was no fog, and lights were easily discernible. The tide was running downstream, and the ordinary flow thereof was increased by reason of the freshets of that season of the year. On the right-hand side of the river, ascending the same, was the Oregon shore; on the left-hand side was Puget Island. At the point of the accident, and for a distance of about a mile above the same, the river was about one-half of a mile wide. Deep water prevailed from shore to shore. The channel was designated by a range line extending approximately down the center of the river; the range line being delineated by range lights placed at appropriate points on the shore. About one mile up the river from the point of the accident it made a turn to the eastward around a point of Puget Island, forming an angle of about 135 degrees.

The pilot, who was in charge of the Samson and the barges which she was towing, testified that he first saw the Henderson and the oil barge coming up the river as he was rounding the point of Puget Island at the bend of the river; that the Samson was then well over on the island side of the river, and only about 400 feet from that shore; that, upon observing the Henderson, he immediately ported his helm; that, when the Henderson had reached a point about one-half of a mile down the river, she blew one whistle, thereby indicating that she intended to pass the Samson port to port; that he immediately answered with one whistle; that, upon the exchange of these signals, he ported his helm a little more; that about two minutes intervened between the time when he first saw the Henderson and the time when the whistles were exchanged and the helm of the Samson further ported; that at the latter time he was about 800 feet off of the Puget Island shore; that he continued to put his helm to port until he was within about 400 feet of the Henderson; that the Henderson then gave another whistle, again signifying her intention to pass port to port; that he answered this second signal, and then put the helm of the Samson hard over to port; that he was then about 800 feet from the Puget Island shore; and that the collision occurred almost immediately after the second whistles were exchanged. The evidence is conflicting as to which of the barges in tow of the Samson struck the Henderson. Both barge

No. 9, which was lashed to the port side of the Samson, and barge No. 27, which extended out in front of the Samson, were damaged to some extent, and it is very probable that both of them contributed to the hole which was torn in the port bow of the Henderson just aft of the stem. The oil barge was not damaged. The lines by which the Henderson was lashed to the oil barge were broken by the force of the impact, and she sank almost immediately thereafter, drifted down the river for some distance, and was later beached by the Samson in shallow water along the Oregon side of the river. After the collision, the oil barge was anchored in the river about 200 feet from the Oregon shore. The Samson's barges were also anchored, but the testimony is in conflict as to their positions; the pilot of the Samson testifying that they were anchored within 200 feet of the Puget Island shore, and some fishermen, who were tending their nets in the vicinity, testifying that two of them were anchored on the Oregon side of the river and the third on the Puget Island side.

So far as the signals exchanged between the vessels prior to the collision are concerned, the testimony is in all substantial respects without conflict. But the testimony relating to the position of the Henderson and of the Samson at the time of the collision, with respect to the range line marking the channel of the river, is absolutely irreconcilable. The range line, as we have stated, extended up the middle of the river. In view of the signals which had been exchanged between the vessels, the Henderson was therefore entitled to all of that portion of the stream lying on the Oregon side of the range line, and the Samson was entitled to all of that portion of the stream lying on the Puget Island side of the range line. Each of the parties, appreciating these facts, endeavored to show that its vessel was on its rightful side of the river, and that the collision was caused by the vessel of the other party transgressing thereon.

Witnesses for the libelant, including the pilot who was in charge of the Henderson and the oil barge, testified that the collision occurred on the Oregon side of the river, and the libelant contended that the position of the oil barge after the accident conclusively established the exact position of the Henderson at the time of the collision. On the other hand, witnesses for the claimant of the Samson testified that the collision occurred well over on the Puget Island side of the river, and the claimant points to certain testimony with respect to the position of the stone barges after the collision as conclusive of the question.

[1] Out of the great mass of conflicting testimony with respect to the maneuvers of the respective vessels prior to the collision, and the positions of the various tows thereafter, the learned judge of the court below found that the point of collision was well to the Oregon side of the channel, and concluded that the fault was with the Samson. This finding, under well-settled rules of appellate procedure, should not be disturbed. Spencer v. Dalles, P. & A. Navigation Co., 188 Fed. 865, 868, 110 C. C. A. 499. As said by this court in The Alijandro, 56 Fed. 621, 6 C. C. A. 54:

"The rule is well settled that in cases on appeal in admiralty, when the questions of fact are dependent upon conflicting evidence, the decision of the district judge, who had the opportunity of seeing the witnesses and judging

their appearance, manner, and credibility, will not be reversed, unless it clearly appears that the decision is against the evidence."

[2] In the present case we think the finding of the trial judge is fully supported by the great weight of the evidence. The reasonable inference to be drawn from the testimony of the pilot of the Samson is that at the time of the collision, and for some time prior thereto, he did not have complete control of his tugboat and the barges which he was towing. The tide was running down the river. In addition, it was the flood season of the year, when the currents of the river were particularly strong. The pilot testified that, at the point of the island where he made the turn to go down the river, the current had a tendency to set over to the Oregon shore, although the full sweep of the current did not commence until a point about 200 feet off the Puget Island shore was reached. Yet, despite his knowledge of these facts, he proceeded to round the point of the island, with the three barges heavily loaded with stone, at a speed of about seven miles an hour, and, as he himself testified, at a distance of about 400 feet off the Puget Island shore. That he got caught in the sweep of the current and lost control of the Samson and of her tows is shown by his testimony to the effect that when he first sighted the Henderson he had his helm aport and was about 400 feet from the Puget Island shore; that, after sighting the Henderson and receiving her first signal, he further ported his helm; that he continued with his helm almost hard aport for a distance of about one-half of a mile or until he got the second signal from the Henderson, and that at this latter time he was 800 feet from the Puget Island shore. In explanation of this he admitted that he thought the Samson drifted away from the island "on account of the current setting her off." He further testified as follows:

"Q. Still not seeing you were getting closer to the island, but on the contrary getting further away, why didn't you give hard aport helm? A. I gave her hard aport helm just before the second whistle was given. She was swinging, heading toward the island all the way. I couldn't do more than keep her that way, but she was going down broadside. Q. Didn't you think it was your duty when nervous about this bad steering and trying to give plenty of room, when you were not getting closer to the island but further away, don't you think it was your duty to put your helm hard aport? A. She was going over all the time. Giving more port helm all the time. Q. Wasn't she going away from the island? A. I couldn't help that. The boat wouldn't shove the scow in. That is all there was to it. Q. Could have by giving hard aport helm, couldn't you? A. I don't think so; would have laid right across the current with hard aport helm. Q. Do you mean you couldn't control the tow there? A. Not to get in the island that short a space; no, sir."

But the pilot insisted that, despite the fact that the Samson and the barges were caught in the sweep of the tide and were beyond his control, still at no time was he further than 800 feet from the Puget Island shore, or about one-third of the distance across the river. We think the position of the oil barge after the collision in and of itself conclusively refutes this statement. She was broken away from the Henderson by the force of the collision, and, although there is some conflict in the testimony, it is strongly in favor of the fact that her anchors were dropped within a few seconds thereafter. There is no dispute

that the oil barge was anchored about 200 feet, or, as some of the witnesses testified, within her own length (300 feet), of the Oregon shore.

[3] 2. The trial judge found that the Henderson, by reason of the collision, became a total loss; and, although there is some testimony to the effect that she could have been raised and repaired for a comparatively small sum, we think that the testimony to the effect that she was a total loss, coupled with the condition of the vessel as shown by the photographic exhibits introduced by the libelant, show that the conclusion reached by the court below was right. It appeared from the testimony of the libelant that there was no general market for vessels of the type of construction of the Henderson, and that no market value thereof could be deemed fixed. This testimony was not controverted by the claimant. The libelant then introduced testimony tending to show the original cost of the vessel, and also the extent to which she had depreciated in value. This, in the absence of market value, was the next best evidence of value.

"The measure of damages in case of total loss is the market value of the vessel at the time of the collision, together with its cargo and freight, and such other losses as are a direct result of a collision. * * * When the conditions are such that no market value can be shown, where there is no market value, or, if shown, it is so manifestly disproportionate to the intrinsic value of the vessel that to order a sale at such a price would be a hardship, the court may adopt as the value of the ship the cost of construction, with proper deduction for the deterioration in its value from the time of construction." Spencer on Marine Collisions, § 200.

By this method the court found that the value of the Henderson at the time of the collision was $38,888.21. From this sum was deducted $8,520.16, representing the net value of certain machinery salvaged from the wreck, leaving $30,368.05, to which was added the sum of $502.70, representing the value of supplies lost with the vessel, making a total of $30,870.75, for which a judgment was entered against the claimant.

The claimant contends that the amount of the judgment was excessive. We do not understand that it denies that the method employed by the trial judge in arriving at the amount of damages was not the correct one; but it insists that the amount was excessive, in view of certain testimony introduced by it showing a greater percentage of depreciation of the vessel than that adopted by the court, and also in view of certain testimony with respect to the amount which should have been awarded as the net value of the salvage. The testimony on each of these items is very conflicting. We have read all of it, and are unable to state that the record contains testimony of greater weight than that upon which the conclusion of the trial judge was based. The testimony of the builder of the Henderson was to the effect that she cost $51,-597.60 at the time of her construction in 1901; that she was ten years old at the time she was sunk; and that the depreciation on all parts of her during that period would amount to $7,709.39, leaving a value at the time of the collision of $43,888.21. But, in view of other testimony tending to show a greater depreciation than that stated by the builder of the Henderson, the trial judge reduced the value of the Henderson $5,000, thus fixing the true value thereof at $38,888.21. We are of opinion that the latter amount is not excessive.

The judgment of the court below is affirmed.